**Affirmed and Majority and Concurring Opinions filed November 26, 2019.**



In The

# Fourteenth Court of Appeals

### NO. 14-16-00959-CR

## ROBERT HOCKO, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 248th District Court
Harris County, Texas
Trial Court Cause No. 1486324**

## M A J O R I T Y   O P I N I O N

A jury convicted Appellant Robert Hocko of criminally negligent homicide and sentenced him to 15 years' confinement. In five issues, Appellant challenges the trial court's judgment and asserts (1) the trial court erred by denying a hearing on his motion for new trial; (2) the trial court erred by denying his motion for new trial; (3) the trial court's jury charge incorrectly instructed the jury on his self-defense claim; (4) the jury's deadly-weapon finding is not supported by legally sufficient evidence; and (5) his conviction for criminally negligent homicide is not

supported by legally sufficient evidence.  For the reasons below, we affirm.

Appellant was arrested and charged with murder in connection with the death of Complainant Daniel Perez following an altercation at The Spot Club in northeast Houston.  Following a three-day jury trial in November 2016, the jury found Appellant guilty of criminally negligent homicide and found that Appellant's hand was a deadly weapon.  The trial court sentenced Appellant to 15 years' imprisonment.

## I.      Guilt-Innocence Phase

Theresa Walker, a manager and bartender at The Spot, was the first witness to testify at Appellant's trial.  Walker testified that, during the afternoon of October 18, 2015, Heidi McKay and Angela Bowyer were holding a bikini bike wash at The Spot to pay their bills.  Appellant, McKay's ex-husband, accompanied McKay and Bowyer to The Spot.

Walker said Complainant arrived at The Spot at approximately 2:00 p.m. to get his motorcycle washed.  Walker said she was "good friends" with Complainant and would regularly see him at The Spot and at neighborhood barbeques.

Walker testified that the incident at bar occurred at approximately 6:00 p.m. Walker said she was inside the bar when she looked out the window and saw Appellant on the patio; Appellant was "enraged" and "pulling off his shirt and lunging to go fight someone."  According to Walker, Appellant had gotten into an argument with Robert Augustine, another patron at The Spot.  Walker walked outside the bar onto the patio and told Appellant to leave the property.  Walker said Complainant was standing near Appellant and Augustine, telling Appellant, "We're all brothers here.  Nobody wants to fight."  According to Walker,

Appellant punched Complainant twice and Complainant fell to the ground after the second hit.

Walker testified Complainant "took a little bit" to get up and was "very confused and very disoriented." Walker said Complainant had cuts on his face, had swollen eyes, and was very dazed. While Complainant was getting his bearings, Appellant was trying to get inside the bar — Walker testified that she and McKay were trying to prevent him from entering. Walker recalled that Appellant struck McKay with his hand several times.

Walker testified Complainant was coming to McKay's aid and again told Appellant, "Nobody wants to fight you." Complainant "trie[d] to hug" Appellant and Appellant again hit Complainant in the face. Walker said Complainant fell to the ground unconscious and was bleeding from his ears. She testified that while Complainant was on the ground, Appellant "[c]ame back and hit him five more times" in the face and kicked him in the head. Walker said Complainant walked away from The Spot towards the store across the street. Walker called 911 and an ambulance arrived at the scene approximately five minutes later. Complainant died from his injuries.

The Spot had an outdoor security camera that captured most of the altercation; footage of the altercation was admitted into evidence during Walker's testimony. The footage shows the following sequence of events:

- Appellant is sitting in a patio chair near Augustine. Appellant stands and joins Augustine's conversation. Complainant is standing nearby.

- Appellant and Augustine walk out of the camera's frame, followed by Complainant. Appellant and Augustine walk back into the frame and stand by the patio ledge. Complainant walks into the frame and pats Appellant on the back several times.

- Augustine looks toward Appellant while assuming a fighting stance.

3

Complainant stands in the middle of the two men. Walker walks outside the bar and begins gesturing towards the men. Appellant exits the frame.

- A now-shirtless Appellant enters the frame rushing at Augustine. Complainant and McKay try to hold Appellant back. Complainant wraps Appellant in a bear hug and moves him to the opposite side of the patio. Appellant struggles to get away from Complainant and strikes him in the face.

- Appellant walks out of the frame followed by Complainant and McKay. An ashtray is thrown at Augustine from Appellant's direction. Appellant and Augustine again move towards each other in a fighting stance. Complainant's legs are visible by a parked truck as he tries to stand up.

- Augustine walks inside the bar. Appellant tries to enter the bar but Complainant and McKay pull him away from the bar's entrance. Complainant wraps his arm around Appellant's neck and shoulders. Appellant strikes Complainant once in the stomach and once in the face, and Complainant falls to the ground. Appellant walks out of the frame.

- A low wall separates Complainant's body from the security camera. Several moments pass, then a quick and forceful motion is seen at the edge of the frame near where Complainant's body fell.

- At that exact moment, at least five people were in the frame. One man in orange (who had been standing safely behind a low wall) immediately takes a step away from the scene, turns and walks away, throws his hand up in the air, and begins to yell. He then turns back towards the scene, continues to yell, and aggressively shakes his hands in the direction where Complainant fell and Appellant was last seen (which was also where the forceful movement was seen).

- Immediately after the man in orange began yelling, another man in pink, Saldino Munoz, extended his arm away from his body over the general area where Complainant was last seen; he then kneels down.

- While facing the parking lot, Walker and Bowyer are yelling and gesticulating wildly. Walker kneels down near where Complainant fell then stands up and walks into the bar with McKay and Bowyer. Bowyer walks out of the bar carrying what appears to be towels and Walker walks out while talking on the phone.

- The following moments of the video simultaneously depicted onlookers' interest, disgust, and panic.

As relevant to our analysis of Appellant's issues on appeal, we briefly discuss the testimony of eight other witnesses.

***Robert Augustine***.   On October 18, 2015, Augustine said he was on The Spot's patio talking to two other people about a cut on his finger.  Augustine said Appellant walked up to him, made a disparaging remark, and slapped his hand.  Augustine said he and Appellant began arguing and Appellant threw two ashtrays at him.  Augustine said Complainant tried to prevent the men from fighting and told Appellant, "Hey, man, no fighting, no fighting."  Augustine saw Appellant hit Complainant one or two times.  Describing Complainant's injuries, Augustine said his head was "pretty bad[ly] beaten" and his lips, his right jaw, and the side of his head were swollen.

***Saldino Munoz***.   Munoz was having a drink at The Spot when the altercation occurred.  Munoz said people were arguing when Appellant took off his shirt and became aggressive.  Munoz testified that Appellant was trying to fight Augustine when Complainant intervened.   Munoz said Complainant did not become aggressive with or yell at Appellant during the altercation — Complainant "just got in between, you know, trying to calm things down."  Munoz testified that Appellant hit Complainant in the face several times.   Munoz testified that Complainant fell to the ground twice and did not stand up after the second fall.  After Complainant's second fall, Munoz said Appellant approached him and "pounded him three times while he was out cold."

***Heidi McKay***.   McKay testified that she was washing a vehicle when she heard people arguing on The Spot's patio.  McKay said Appellant and Augustine were "antagonizing each other trying to fight each other."

5

McKay said she got between Appellant and Augustine and tried to stop Appellant from fighting. Complainant tried to assist in preventing the fight. McKay saw Complainant fall; when Complainant got up, she saw he was bleeding from his face. Augustine entered the bar and Appellant tried to follow him. McKay said she and Complainant were trying to prevent Appellant from entering the bar when she saw Complainant fall again. McKay did not see Appellant punch Complainant. McKay believed that is what caused Complainant to fall, and testified Appellant was "responding and defending himself."

***Angela Bowyer***. Describing the incident, Bowyer said Appellant was trying to get in a fight with Augustine while Complainant was trying to "defuse the situation" and telling Appellant to "calm down." Bowyer said after Appellant punched Complainant, Complainant fell face-down on the ground and "busted his nose and . . . was bleeding pretty bad." Bowyer recalled that Appellant was walking to the bar when Complainant again intervened — Bowyer said Appellant hit Complainant and Complainant fell "immediately on his back." After Complainant was on the ground, Bowyer testified Appellant hit Complainant several more times in the face and told him, "sorry man, look — see what you made me do."

***Officer Ryan Naughton***. Officer Naughton arrived at the scene and saw Complainant laying on the ground, unconscious and not breathing. Officer Naughton said he saw "a large amount of blood on the concrete." Officer Naughton said he did not see any weapons at the scene and did not receive any reports regarding weapons at the scene.

***Officer Nicholas Duval***. After the incident, Officer Duval was driving around the area near The Spot searching for Appellant. Officer Duval drove through a grocery store parking lot and found Appellant hiding under a truck.

6

Officer Duval said Appellant stated he got "in a fight with two guys" at The Spot. Officer Duval said Appellant's breath smelled like alcohol and that his eyes were bloodshot.

***Officer Michael Donato***.  Officer Donato was present when Appellant was found under the truck.  Officer Donato said Appellant was angry and "obviously intoxicated."  According to Officer Donato, Appellant said he "had drank a six-pack earlier that day, consumed one shot of whiskey, and two beers."  Officer Donato said Appellant failed a horizontal nystagmus field sobriety test.

***Ana Lopez, M.D.***  Dr. Lopez is the medical examiner who performed an autopsy on Complainant's body.  Dr. Lopez testified that Complainant's injuries included facial abrasions and contusions, skull fractures, subdural and subarachnoid hemorrhages, contusions of the brain, and blunt neck trauma.  Dr. Lopez identified at least three impacts causing skull fractures.  Dr. Lopez stated that "the trauma in and of itself really caused [Complainant's] death."

***Appellant***.  On the afternoon of the altercation, Appellant said Augustine was saying "offensive things" that made him mad.  Appellant testified he challenged Augustine to a fight.  Appellant said Complainant grabbed him and put him up against a wall — Appellant testified that he felt "threatened" and struck Complainant in the face.

After striking Complainant, Appellant said he again called Augustine "out to the grass area" away from everyone else so they could "finish [their] altercation." Appellant said Complainant grabbed him again.  Appellant said he pushed Complainant and their feet got tangled up, causing Complainant to fall on his face. Appellant said Augustine entered the bar and continued to "agitate" him and "yell[] obscenities."  According to Appellant, Augustine said he was going inside the bar to get a gun.

7

Appellant was trying to get into the bar when Complainant grabbed him around the neck. Appellant said he punched Complainant in the stomach and the head. Appellant testified that he felt like he was defending himself and "felt like [he] was being attacked." Appellant said he did not beat Complainant when Complainant was on the ground, but only "slapped him once."

After the parties rested, the trial court charged the jury on the offense of murder and the lesser-included offenses of manslaughter and criminally negligent homicide. The jury returned a verdict finding Appellant guilty of criminally negligent homicide. In response to a special issue, the jury found Appellant used or exhibited a deadly weapon, namely, his hand, in the commission of the offense.

## II.     Punishment Phase

Eight witnesses testified at the punishment phase of Appellant's trial, including Appellant. Relevant to one of our analyses, Jose Mejia testified about a 2010 incident at a mobile home park. Mejia said he was arguing with Jason Clayburn, a resident at the mobile home park, when Appellant "got in the middle" and hit Mejia. Mejia said Appellant hit him in the mouth and that he had to get stitches for his injury.

Appellant addressed the 2010 mobile home park incident in his testimony. Appellant said he was pulling into the park when he saw someone throwing beer bottles at Clayburn. Appellant said Mejia started kicking Clayburn's mother's car and Clayburn's mother came outside of her mobile home. Appellant said he got in between Mejia and Clayburn's mother and Mejia approached him with a beer bottle in his hand. Appellant said he struck Mejia one time in the mouth and was taken to jail. Appellant was convicted of assault and sentenced to ninety days' imprisonment.

8

After the parties rested, the jury assessed punishment at 15 years' confinement. Appellant timely appealed.

## ANALYSIS

Appellant asserts five issues on appeal:

1. Appellant's conviction for criminally negligent homicide is not supported by legally sufficient evidence;

2. the jury's deadly-weapon finding is not supported by legally sufficient evidence;

3. the trial court erred by denying his request for a hearing on his new trial motion;

4. the trial court erred by denying his new trial motion; and

5. the trial court erred by overruling his objection to the self-defense instruction in the jury charge.

We address these issues individually.

## I. Legally Sufficient Evidence Supports Appellant's Conviction for Criminally Negligent Homicide.

In his fifth issue, Appellant asserts legally insufficient evidence supports (1) the jury's findings with respect to criminally negligent homicide and (2) the jury's implicit rejection of Appellant's self-defense claim.[1]

### A. Standard of Review and Governing Law

When reviewing a legal sufficiency challenge, we view the evidence in the light most favorable to the verdict to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902 n.19 (Tex. Crim. App. 2010). The jury is the sole judge of the credibility of witnesses and the weight to be assigned to their

---

[1] A jury's "guilty" verdict is an implicit rejection of the defendant's self-defense theory. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

testimonies, and we do not usurp this role by substituting our judgment for that of the jury. *Id*. at 899. When the record supports contradicting inferences, we presume the jury resolved any such conflicts in favor of the verdict. *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

A legally sufficient showing of criminally negligent homicide requires the State to have proven that (1) the defendant's conduct caused the death of an individual; (2) the defendant ought to have been aware that there was a substantial and unjustifiable risk of death from the defendant's conduct; and (3) the defendant's failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under like circumstances. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012); *see also* Tex. Penal Code Ann. §§ 6.03(d) (Vernon 2011), 19.05(a) (Vernon 2019). To constitute a gross deviation from the ordinary person standard of care, the defendant's conduct must be such that any reasonable person sharing the community's sense of right and wrong would know it. *Montgomery*, 369 S.W.3d at 193. For example, conduct such as an abrupt lane change in front of another vehicle that results in death or using a homemade trailer with obvious defects that came loose and killed a pedestrian are sufficiently blameworthy acts to constitute criminal negligence. *See id*. (lane change); *Tello v. State*, 180 S.W.3d 150, 157-58 (Tex. Crim. App. 2005) (loose trailer hitch). "In finding a defendant criminally negligent, a jury is determining that the defendant's failure to perceive the associated risk is so great as to be worthy of a criminal punishment." *Montgomery*, 369 S.W.3d at 193.

In reviewing the legal sufficiency of the evidence supporting a conviction relative to a claim of self-defense, we do not look at whether the State refuted the self-defense theory but whether, after viewing all the evidence in the light most

10

favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt and could have found against the self-defense theory beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). A person generally is justified in using deadly force against another in self-defense if, among other things, that person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful deadly force. *See* Tex. Penal Code Ann. §§ 9.31, 9.32 (Vernon 2019).

## B.    Application

Challenging the jury's finding with respect to his failure to perceive the risks of his conduct, Appellant points out that he "never approached [Complainant] or instigated an altercation with him" but instead hit Complainant "to get [Complainant] away from or off of him." These same facts, Appellant argues, show the jury's implicit finding against his self-defense claim is not supported by legally sufficient evidence.

Contrary to Appellant's argument, legally sufficient evidence supports the jury's finding with respect to Appellant's failure to perceive the risks of his conduct. Five eyewitnesses testified that Appellant punched Complainant in the face numerous times and that Complainant fell and was unconscious after the final hit. All five witnesses testified that Complainant was trying to prevent an altercation between Appellant and Augustine and that Complainant was not aggressive with and did not hit Appellant. In addition, Walker, Munoz, and Bowyer testified that Appellant continued to strike Complainant in the face several times while Complainant was lying on the ground unconscious.

Video footage from The Spot supports (without definitively establishing) this sequence of events. The footage shows Appellant becoming aggressive and

striking Complainant several times. After Complainant falls to the ground the second time, the footage shows a commotion near where Complainant fell — supporting Walker's, Munoz's and Bowyer's statements that Appellant continued to hit Complainant after Complainant was on the ground. Rational jurors also could have found Appellant struck Complainant after he had fallen to the ground; therefore, they also could have found Appellant ought to have been aware that there was a substantial and unjustifiable risk of death from his conduct. Taken together, the video and testimony provide sufficient evidence to support the jury's finding regarding Appellant's failure to perceive that the risks of his conduct constituted a gross deviation from the ordinary person standard of care (particularly in light of their written questions to the trial court and the court's answers thereto).

Moreover, Officer Naughton testified there was "a large amount of blood on the concrete" at The Spot when he arrived after the altercation. Dr. Lopez testified with respect to Complainant's extensive injuries and identified at least three impacts that caused skull fractures. This evidence regarding Complainant's injuries — and the force with which he was struck — further supports the jury's finding that Appellant's actions grossly deviated from the standard of care an ordinary person would have exercised under like circumstances.

Appellant's challenge to this finding and his argument addressing his self-defense claim focus on his version of events and his contention that he struck Complainant "to get [Complainant] away from or off of him." Appellant also asserts he "never began an argument" with Complainant and became involved in the physical altercation with Complainant only after Complainant "physically attacked Appellant on two separate occasions." But the jury was not bound by this testimony — rather, as the sole judge of the credibility of the witnesses and the

weight to be assigned to their testimonies, the jury was free to disregard Appellant's version of events. *See Brooks*, 323 S.W.3d at 899; *see also Smith v. State*, 355 S.W.3d 138, 146 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (noting the defendant's testimony does not conclusively prove a claim of self-defense because the jury could reject the testimony). As discussed above, multiple witnesses testified that Appellant hit Complainant numerous times, and continued to hit Complainant after Complainant fell to the ground unconscious. Likewise, multiple witnesses testified that Complainant was not aggressive with and did not hit Appellant. Moreover, Appellant left the scene after the altercation with Complainant and was found hiding under a truck in a grocery store parking lot. This evidence, from which an inference of guilt may be drawn, also supports the jury's implicit rejection of Appellant's self-defense claim. *See Smith*, 355 S.W.3d at 147 (finding that flight of defendant, who claimed self-defense, immediately after stabbing constituted circumstantial evidence of his guilt).

Reviewing the evidence in the light most favorable to the State, a rational jury could have found the essential elements of the offense beyond a reasonable doubt and could have found against Appellant's self-defense claim (as per the jury instructions) beyond a reasonable doubt. We overrule Appellant's fifth issue.

## II. Legally Sufficient Evidence Supports the Jury's Deadly-Weapon Finding.

We next address Appellant's fourth issue, in which he asserts the evidence is legally insufficient to support the jury's finding that his hand was a deadly weapon. This enhancement caused him to be sentenced to more than 10 years in prison.

The Texas Court of Criminal Appeals has held that when addressing legal sufficiency challenges to deadly-weapon findings, "[w]e review the record to determine whether, after viewing the evidence in the light most favorable to the

13

State, any rational trier of fact could have found beyond a reasonable doubt" that the object allegedly used was a deadly weapon. *Pruett v. State*, 510 S.W.3d 925, 927 (Tex. Crim. App. 2017) (citing *McCain v. State*, 22 S.W.3d 497, 504 (Tex. Crim. App. 2000) (citing *Tisdale v. State*, 686 S.W.2d 110, 114-15 (Tex. Crim. App. 1984))); *see also King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting a legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute [its] judgment for that of the jury."). "Texas courts have consistently recognized that a hand may be a deadly weapon within the meaning of section 1.07(a)(17)(B), 'depending upon the evidence shown.'" *Stepherson v. State*, 523 S.W.3d 759, 764 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (quoting *Lane v. State*, 151 S.W.3d 188, 191 (Tex. Crim. App. 2004)).[2] Texas courts have found anything that is "capable of causing death or serious bodily injury" to constitute a deadly weapon. *Blount v. State*, 257 S.W.3d 712, 714 (Tex. Crim. App. 2008).[3] In other words, "[A]nything . . . which is actually used to cause the death of a human being is a deadly weapon. This is necessarily so

---

[2] *See also Quincy v. State*, 304 S.W.3d 489, 499 (Tex. App.—Amarillo 2009, no pet.) ("A hand or a foot may be a deadly weapon within the statutory meaning 'depending upon the evidence shown.'") (citing *Lane*, 151 S.W.3d at 191 (quoting *Turner v. State*, 664 S.W.2d 86, 90 (Tex. Crim. App. 1983))).

[3] *See also* Tex. Penal Code Ann. § 1.07(a)(17) (a deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."); *Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008); *Romero v. State*, 331 S.W.3d 82, 83 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) ("To prove that appellant's weapon was deadly, the State must prove that the shank (1) was manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or (2) is capable of causing death or serious bodily injury in the manner of its use or intended use.") (citing Tex. Penal Code Ann. § 1.07(a)(17) (Vernon 2003)); *Thomas v. State*, 821 S.W.2d 616, 619 (Tex. Crim. App. 1991); *Brown v. State*, 716 S.W.2d 939, 946 (Tex. Crim. App. 1986)); *Villanueva v. State*, 194 S.W.3d 146, 159 (Tex. App.—Houston [1st Dist.] 2006), *aff'd in part and rev'd in part by* 227 S.W.3d 744 (Tex. Crim. App. 2007) (holding evidence sufficient to support deadly-weapon finding when evidence showed that defendant used his hands to shake child, causing head injuries); and *Morales v. State*, 792 S.W.2d 789, 790-91 (Tex. App.—Houston [1st Dist.] 1990, no pet.) (holding evidence sufficient to support deadly-weapon finding when evidence showed that defendant used his hands to suffocate victim).

because a thing which actually causes death is, by definition, 'capable of causing death.'" *Tyra v. State*, 897 S.W.2d 796, 798 (Tex. Crim. App. 1995) (quoting Tex. Penal Code Ann. § 1.07(a)(17)). A "deadly weapon" is anything that in the manner of its use or intended use is capable of causing death or serious bodily injury. Tex. Penal Code Ann. § 1.07(a)(17). "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of any function of any bodily member or organ. *Id.* at (a)(46).

Here, the jury was asked:

Do you . . . find beyond a reasonable doubt that the defendant used or exhibited a deadly weapon, namely, his hand, during the commission of the offense for which he has been convicted or during the immediate flight therefrom?

The jury answered, "We do".

Here, the evidence was legally sufficient for a rational jury to find Appellant's intended use of his hand was capable of causing death or serious bodily injury. *See Pruett*, 510 S.W.3d at 927. When determining whether an object was used as a deadly weapon, the fact-finder may consider the physical proximity between the complainant and the object, any threats or words used by the defendant, the manner in which the object was used, and testimony that the object had the potential to cause death or serious bodily injury. *See Hopper v. State*, 483 S.W.3d 235, 239 (Tex. App.—Fort Worth 2016, pet. ref'd); *see also Sadler v. State*, 364 S.W.2d 234, 237 (Tex. Crim. App. 1963) ("[T]he jury had . . . evidence from which they found an *intention* to kill, considering the relative size, weight and strength of the parties" where male defendant over 6 feet tall weighing 190 pounds killed female 5 feet tall weighing 90 to 100 pounds by hitting her face and head with his hands and fists) (emphasis added); and *Martin v. State*, 246

S.W.3d 246, 264 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (difference in size "contributes to a showing of intent").

Here, a rational jury could have found any or all of the following:

- Appellant struck Complainant (a larger man) in the face twice;

- Appellant's strikes made Complainant fall to the ground;

- Complainant "took a little bit" to get up;

- Complainant was "very confused and very disoriented";

- Appellant was aware he made contact with Complainant, knocked him down, and caused disorientation;

- when Complainant arose, he had cuts on his face, had swollen eyes, was very dazed, and was bleeding from his face;

- Appellant was aware Complainant was (among other things) bleeding;

- Appellant punched Complainant a third time;

- Appellant's strike made Complainant fall to the ground a second time;

- Complainant was unconscious;

- Complainant was "bleeding from the ears"; and

- Appellant thereafter struck Complainant one or more times with his hand (and possibly also his foot).

Based on these facts, a rational juror in Texas could find that the defendant used or exhibited his hands in a manner that was intended to cause death or serious bodily injury. *Cf. Davis v. State,* 533 S.W.3d 5498, 510 (Tex. App.—Corpus Christi 2017, pet. ref'd) (reversing where "a rational trier of fact could not have found beyond a reasonable doubt that appellant used his hands in a manner capable of causing death or serious bodily injury").

16

We overrule Appellant's fourth issue.

## III. The Trial Court Did Not Err When It Denied Appellant's Request for a Hearing on His New Trial Motion.

In his motion for a new trial, Appellant asserted (1) his due process rights were violated by the State's alleged use of false testimony during the guilt-innocence phase of trial and (2) he received ineffective assistance of counsel during the punishment phase of trial. Arguing the trial court erred when it denied his request for a hearing on his new-trial motion, Appellant contends his motion raised matters that were not determinable from the record.

### A. Standard of Review

We review the trial court's denial of a hearing on a motion for new trial for abuse of discretion and reverse only if the trial court's decision was clearly wrong and outside the zone of reasonable disagreement. *Jenkins v. State*, 495 S.W.3d 347, 353 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see also Harris v. State*, 475 S.W.3d 395, 404 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). The purposes of a hearing on a new-trial motion are to determine whether the cause should be retried and to prepare a record that would enable the defendant to present the new-trial issues on appeal if the court denies the motion. *See generally Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009).

A criminal defendant does not have an "absolute right" to a hearing on his motion for new trial. *Hobbs v. State*, 298 S.W.3d 193, 199 (Tex. Crim. App. 2009); *Chapa v. State*, 407 S.W.3d 428, 431 (Tex. App.—Houston [14th Dist.] 2013, no pet.). But a trial court abuses its discretion in failing to hold a hearing if the motion and accompanying affidavits (1) raise matters that are not determinable from the record, and (2) establish reasonable grounds showing that "the defendant could potentially be entitled to relief." *Hobbs*, 298 S.W.3d at 199.

17

## B.   Alleged False Testimony

Asserting Walker's testimony at trial differed from the statements Walker made during her 911 call, Appellant argues the State's failure to correct Walker's trial testimony violated his right to due process. Appellant contends a hearing on this point was necessary to "develop a full record and to admit the 911 tape for consideration of this issue on direct appeal."

Attached to his new-trial motion was a transcript of Walker's complete 911 call. This transcript permitted the trial court to fully evaluate Appellant's false testimony claim and to determine whether the issue warranted a new trial. Accordingly, this issue did not raise matters that were indeterminable from the record and a hearing thereon was therefore unnecessary. *See Hobbs*, 298 S.W.3d at 199; *see also Lempar v. State*, 191 S.W.3d 230, 235 (Tex. App.—San Antonio 2005, pet. ref'd) (holding the trial court's evidentiary ruling was determinable from the record and defendant therefore was not entitled to a hearing on his new trial motion).

## C.   Ineffective Assistance of Counsel Claim

Arguing he received ineffective assistance of counsel during the punishment phrase of trial, Appellant asserts his trial counsel failed to conduct a factual investigation and failed to secure Jason Clayburn as a witness. Clayburn's testimony was necessary, Appellant argues, because it would have contradicted Mejia's testimony about the 2010 mobile home park incident. Appellant asserts this issue entitled him to a hearing and raised matters not determinable from the record, namely, "whether or not Clayburn's testimony could have affected the punishment verdict in the case."

Appellant attached to his new-trial motion Clayburn's affidavit, which

18

states, in relevant part, as follows:

> My name is Jason Clayburn. On June 27, 2010, I was at my mother's home, which is on Campbell Road. The people in the trailer next door were outside having a good time, so I went over there to hang out with them.
>
> The trailer park manager's boyfriend/husband, Jose Mejia, was there. He was drunk and started mouthing off to me. We became involved in a verbal argument with one another. I decided to leave the trailer to get out of the situation. He followed me when I left. He was still yelling at me.
>
> Around the same time, [Appellant] arrived on his motorcycle. He saw Jose Mejia yelling. I remember that Jose Mejia threw a beer bottle. All of this noise caused my mom, Leslie, to come outside. Jose Mejia was also yelling at her, and he was threatening to throw another beer bottle at us. At this time [Appellant] told Jose Mejia that if Jose was going to strike me or my Mom he was going to whoop Jose's ass. Jose then picked up the beer bottle and raised it over his head like he was going [to] throw it. [Appellant] struck him one time in the face to prevent Jose from throwing a beer bottle at me or my mom. Jose fell to the ground and struck his head.
>
> I did not see [Appellant] strike Jose more than one time, and I did not see [Appellant] kick Jose.
>
>         *          *          *
>
> I was called by [Appellant's] brother Zach and asked to come to court and testify about this incident. I was told I had to be in court the next morning. I told Zach that if I had something in writing I could be there, but I needed something to show my work so I would not lose my job. If I had received something in writing I would have been available and willing to testify. I did not receive anything in writing.

We presume without deciding that Appellant's ineffective assistance claim raised matters that were not determinable from the record. We proceed to the second prong of the applicable test and analyze whether this issue established reasonable grounds showing Appellant was potentially entitled to relief. *See Hobbs*, 298 S.W.3d at 199; *see also Moore v. State*, 4 S.W.3d 269, 278 (Tex. App.—Houston

19

[14th Dist.] 1999, no pet.).

To be entitled to a hearing on a new-trial motion asserting ineffective assistance of counsel, a defendant must allege facts showing reasonable grounds to believe the defendant could prevail under both prongs of *Strickland*'s ineffective assistance test. *See Chapa*, 407 S.W.3d at 431. A defendant seeking to challenge trial counsel's representation must establish counsel's performance (1) was deficient and (2) prejudiced the defense. *Smith*, 286 S.W.3d at 340-41 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). To establish deficiency, the defendant must prove by a preponderance of the evidence that counsel's representation objectively fell below the standard of professional norms. *Id*. at 340. To show prejudice, the defendant must show there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Id*.

Our review of trial counsel's representation is "highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance." *Garza v. State*, 213 S.W.3d 338, 348 (Tex. Crim. App. 2007); *see also McCurdy v. State*, 550 S.W.3d 331, 339 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("[W]e indulge a strong presumption that counsel's actions fell within the wide range of reasonable professional behavior and were motivated by sound trial strategy"). The decision whether to present witnesses is largely a matter of trial strategy. *Ortiz v. State*, 866 S.W.2d 312, 315 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd). Moreover, an attorney's decision not to present particular witnesses at the punishment stage may be strategically sound if based on a determination that the testimony of the witnesses may harm the defendant. *See Weisinger v. State*, 775 S.W.2d 424, 427 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd).

Appellant has satisfied only a portion of his burden. Specifically, Appellant introduced proof that a witness had potentially favorable testimony and was not summoned to the relevant phase of his trial; he failed to introduce any evidence, however, that (1) anyone mentioned the affiant to his attorney (much less the details of his sworn knowledge at any time prior to the affidavit being signed) or (2) Appellant's attorney should have known about the affiant's sworn knowledge before receiving his affidavit. Without evidence showing counsel had (or should have had) knowledge of these specific relevant facts, we cannot conclude counsel's performance was deficient.

The trial court did not abuse its discretion by overruling Appellant's request for a hearing on his new-trial motion. We overrule Appellant's first issue.

## IV. Appellant's New-Trial Motion

Appellant also challenges the trial court's denial of his motion for a new trial. We review a trial court's ruling on a motion for new trial for an abuse of discretion. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). "We view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it was within the zone of reasonable disagreement." *Id*. A trial court abuses its discretion in denying a motion for new trial only if no reasonable view of the record could support the trial court's ruling. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004).

### A. Alleged False Testimony

Relying on a comparison of Walker's 911 call with her testimony at trial, Appellant asserts the 911 call relayed a "version of events . . . obviously different from [Walker's] trial testimony." Arguing the State should have recognized the allegedly misleading nature of Walker's trial testimony, Appellant contends the State's failure to correct this testimony violated his due process rights.

Appellant bases his challenge on the following portions of Walker's 911 call:

Dispatch:    Okay now was this a sexual assault or did he just hit on him?

Walker:    Some guy that came up in the parking lot and he started arguing with one of the customers that was sitting outside and the guy told him, dude just go on. And the guy started hitting on him. Knocked him out.

            *                *                *

Dispatch:    Do you remember what [the suspect] had on?

Walker:    I couldn't tell ya what he had on. I just came out briefly.

Appellant also points out that, in her 911 call, Walker did not mention Appellant kicking Complainant. Appellant asserts the 911 call shows he did not "beat or kick" Complainant when Complainant was on the ground and that Walker did not observe what she claimed to have observed.

"The Due Process Clause of the Fourteenth Amendment can be violated when the State uses false testimony to obtain a conviction, regardless of whether it does so knowingly or unknowingly." *Ex parte Robbins*, 360 S.W.3d 446, 459 (Tex. Crim. App. 2011). Testimony need not be perjured to constitute a due process violation — rather, it is sufficient that the testimony was false. *Ex parte Chavez*, 371 S.W.3d 200, 208 (Tex. Crim. App. 2012). A violation also arises when the State fails to correct testimony it knows to be false. *See Ex parte Ghahremani*, 332 S.W.3d 470, 477 (Tex. Crim. App. 2011). "The question is whether the testimony, taken as a whole, gives the jury a false impression." *Ex parte Chavez*, 371 S.W.3d at 208.

Viewing the evidence in the light most favorable to the trial court's ruling, we conclude the trial court did not abuse its discretion because Walker's trial

testimony compared to the excerpted portions of her 911 call did not necessarily give the jury a false impression. Walker's trial testimony and 911 call both described an argument in The Spot's parking lot that escalated to a physical altercation. Moreover, Walker's statement on the 911 call that she "came out briefly" does not negate the other details discussed in her trial testimony (particularly given that the video showed she was in The Spot's parking lot for substantial portions of the altercation); Walker only said she could not describe the clothes the suspect was wearing. Finally, Walker's failure to mention that Appellant kicked Complainant does not require a conclusion that she lied. Generally, the purpose of a 911 call is to quickly secure emergency assistance — not to describe all of the details surrounding an emergency situation. Emergency responders arrived within five minutes of the call. Accordingly, as compared to her 911 call, Walker's testimony did not give the jury a false impression and did not violate Appellant's due process rights. *See id*.

## B. Ineffective Assistance of Counsel Claim

For the same reasons we concluded the trial court did not abuse its discretion when it denied Appellant a hearing on the ineffective assistance claim raised in his motion for new trial, we also find the trial court's denial of the motion was not arbitrary or unreasonable.

We overrule Appellant's second issue.

## V. Any Charge Error With Respect To the Self-Defense Instruction Was Harmless.

The charge instructed the jury with respect to the law of self-defense and included an application paragraph addressing the use of deadly force under Texas

23

Penal Code section 9.32.[4]  Appellant argues the trial court erred by failing to include an application paragraph in the jury charge applying the law of self-defense regarding non-deadly force pursuant to Texas Penal Code section 9.31.

We review alleged jury charge error by considering two questions: (1) whether error existed in the charge and (2) whether sufficient harm resulted from the error to compel reversal.  *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005); *Ferreira v. State*, 514 S.W.3d 297, 301 (Tex. App.—Houston [14th Dist.] 2016, no pet.).  A defendant is entitled to an instruction on a defensive issue if that issue is raised by the evidence, whether the evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense.  *Walters v. State*, 247 S.W.3d 204, 209 (Tex. Crim. App. 2007).  But, if the evidence, viewed in the light most favorable to the defendant, does not establish a defensive issue, the defendant is not entitled to an instruction on the issue.  *Miller v. State*, 815 S.W.2d 582, 585 (Tex. Crim. App. 1991).

With respect to harm, if there was error in the charge and the defendant objected to the error at trial, "reversal is required if the error 'is calculated to injure the rights of the defendant.'"  *Ferguson v. State*, 335 S.W.3d 676, 684-85 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)).  This standard has been defined to mean "some harm."  *Id*. at 685.  But if the charge error was not objected to, the error mandates reversal only if it "was so egregious and created such harm that the defendant 'has not had a fair and impartial trial.'"  *Id*. (quoting *Almanza*, 686 S.W.2d at 171).

---

[4] Specifically, a person is justified in using deadly force against another if the person reasonably believed the deadly force was immediately necessary to (1) protect against the other person's use or attempted use of deadly force, or (2) to prevent the other person's imminent commission of certain offenses.  *See* Tex. Penal Code Ann. § 9.32(a)(2) (Vernon 2019).

A defensive issue was raised by the evidence and Appellant was therefore entitled to a self-defense instruction. *See Walters*, 247 S.W.3d at 209. Essentially, Appellant complains he was entitled to a different instruction than the one he received because the jury could have believed "the level of force used by Appellant was equal to what was being used on Appellant by [Complainant]." Presuming this constitutes charge error, Appellant's contention nonetheless is unavailing.

Appellant raised his charge objection at trial and we therefore review the presumed error for "some harm." *See Ferguson*, 335 S.W.3d at 684-85. In assessing "some harm" under *Almanza*, we consider the error in light of (1) the entire jury charge; (2) the state of the evidence; (3) the jury arguments; and (4) any other relevant information as revealed by the record as a whole. *French v. State*, 563 S.W.3d 228, 235-36 (Tex. Crim. App. 2018).

After retiring, the jury asked to see (1) "the testimony of Angela Bowyer's statement regarding the number of times that [Appellant] struck [Complainant] *while on the ground*?" and (2) "the testimony of Teresa Walker regarding the number of times that [Appellant] struck [Complainant] *while on the ground*?" (emphases added). In response, the jury received transcripts showing (1) Bowyer testified (a) Appellant struck Complainant three or four times in the face *while he was unconscious* and (b) that she never said it was two or three times because he only struck him once; and (2) Walker testified Appellant struck Complainant "five more times" *after* Complainant "f[e]ll out" and "kicked" and "stomped" Complainant in his head.

While Appellant's self-defense argument might have merit if the evidence and the jury's findings showed Appellant landed his fatal blow before Complainant hit the ground the second time, that is not what the evidence and findings reflect. Instead, the jury made overbroad requests, the judge issued an instruction to

specify the necessary information, and the jury requested two specific pieces of information concerning a specific set of acts at a specific moment in time. Therefore, we cannot conclude the jury believed Appellant struck the fatal blow before Complainant went down for the second and final time; therefore, the absence of the requested self-defense instruction was harmless. *See Ferguson*, 335 S.W.3d at 684-85. We overrule Appellant's third issue.

## CONCLUSION

Having overruled Appellant's issues on appeal, we affirm the trial court's judgment.


/s/    Meagan Hassan
Justice


Panel consists of Chief Justice Frost and Justices Zimmerer and Hassan (Frost, C.J., concurring).

Publish — Tex. R. App. P. 47.2(b).